UNITED STATES DIST................COU...........**08 CIV 5717**
SOUTHERN DISTRICT O....... Y......

```
---------------------------------------- x
THE POLICE AND FIRE RETIREMENT        :   Civil Action No.
SYSTEM OF THE CITY OF DETROIT, on     :
Behalf of Itself and All Others Similarly  :   CLASS ACTION
Situated,                             :
                                      :   COMPLAINT FOR VIOLATION OF THE
                  Plaintiff,          :   FEDERAL SECURITIES LAWS
                                      :
        vs.                           :
                                      :
                                      :
GILDAN ACTIVEWEAR, INC., LAURENCE     :
G. SELLYN, and GLENN J. CHAMANDY,     :
                                      :
                  Defendants.         :
                                      :   DEMAND FOR JURY TRIAL
---------------------------------------- x
```

## INTRODUCTION

This securities class action is brought on behalf of purchasers of publicly traded securities

of Gildan Activewear, Inc. ("Gildan" or "the Company") between August 2, 2007 and April 29,

2008, inclusive, (the "Class Period"), and seeks to recover damages caused by Defendants'

violations of federal securities laws and to pursue remedies under the Securities Exchange Act of

1934.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331. The claims asserted

herein arise under Sections 10(b), 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and

the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R.

§ 240.10b-5); and Section 304 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7243)

2.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District.

3.     In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## THE PARTIES

**Plaintiff**

4.     Plaintiff, the Police and Fire Retirement System of the City of Detroit (the "Plaintiff"), owned Gildan common stock and securities during the Class Period and has suffered losses for the reasons stated in this Complaint.

**Defendants**

5.     Defendant Gildan is a company headquartered in Montreal, Canada whose shares are traded both on the Toronto Stock Exchange and the New York Stock Exchange ("NYSE"). Its primary business involves manufacturing blank tee-shirts and sweatshirts which are sold at wholesale and ultimately screen-printed with designs and logos for consumer use.

6.     Gildan has an international presence with facilities located in Canada, the United States, China, the United Kingdom, Belgium, Nicaragua, Honduras, Mexico, Barbados, Haiti, and the Dominican Republic.

7.     Defendant Glenn J. Chamandy ("Chamandy"), at all relevant times during the Class Period, served as the Chief Executive Officer ("CEO") and President of Gildan.  In his

capacity as President and CEO, Chamandy oversaw aspects of the Company's operations, including the preparation of revenue recognition and guidance forecasts.

8.      Defendant Laurence G. Sellyn ("Sellyn"), at all relevant times during the Class Period, served as the Chief Financial and Administrative Officer ("CFAO") and Executive Vice President of Gildan. In his capacity as CFAO and Executive Vice President, Sellyn likewise had access to and oversaw numerous aspects of the Company's operations, including the preparation of revenue recognition and guidance forecasts.

9.      Defendants Sellyn and Chamandy are collectively referred to in this complaint as the "Individual Defendants."

10.     In their capacities, the Individual Defendants gained firsthand knowledge and became key participants in the improper guidances issued by the Company, participated in conference calls wherein false statements about the Company's finances were made, and also had access to materially adverse and public information about the business and prospects of the Company.

## SUBSTANTIVE ALLEGATIONS

## DEFENDANTS ISSUE FALSE EARNINGS GUIDANCE

11.     On August 2, 2007, Gildan released its results for the third fiscal quarter of 2007 and its initial earnings guidance for fiscal 2008 in a press release entitled "EPS and Capital Expenditure Guidance for Full Year Fiscal 2007 and 2008." The Company touted its Dominican Republic facility as greatly increasing its future earnings prospects. Specifically, the Company reported in part:

3

*The Company has initiated its EPS guidance for fiscal 2008 with a range of U.S. 1.80-U.S. .$1.85 per share on a diluted basis, up approximately 39% - 42% from fiscal 2007.* The projected growth in EPS in fiscal 2008 is driven primarily by the impact of relocating the Canadian textile operations *and completing the ramp-up of the Company's offshore textile facilities in Honduras and the Dominican Republic,* unit volume growth in active wear, and the expected EPS accretion from having completed the integration of Kentucky Derby Hosiery. (emphasis added)

12.    The Company, on September 18, 2007, went on to reiterate and to even <u>increase</u>

this guidance for fiscal 2008 in a press release announcing an agreement to purchase a sock

supplier, V.I. Prewett & Son, Inc. ("Prewett"). The press release emphasized:

The acquisition of Prewett is expected to be accretive to Gildan's EPS in fiscal 2008, and to increase annual EPS by approximately U.S. $0.20 per share after the acquisition integration is complete. Based on the projected first year accretion from the Prewett acquisition, and a U.S. $7 million further incremental capacity expansion of Gildan's first Honduran sock manufacturing facility, *Gildan now expects to achieve or exceed the high end of its previously announced earnings guidance range for fiscal 2008 of U.S. $1.80- $1.85 per share, representing an increase of over 40% compared with the Company's fiscal 2007 projected EPS of approximately U.S. $1.30 before restructuring charges.*
(emphasis added)

13.    Upon this news, the stock price for Company shares rose by 13% from $31.67 to

$35.92 per share, on unusually high trading volume.

14.    In the subsequent months, the Company continued to reiterate its 2008 guidance.

For example, a December 6, 2007 press release stated that "[t]he Company has reconfirmed its

previous EPS guidance for fiscal 2008 of U.S. $1.85 per share."

15.    On December 19, 2007, the Company filed its Form 40-F in which it stated its

2008 guidance. In it, the Company justified its elevated business prospects by its entry into the

sock market and its Central American (including Dominican Republic) facilities. That filing

stated, in relevant part:

We expect that the acquisition of Prewett will further strengthen Gildan's

4

positioning as a full-product supplier of socks, activewear and underwear for the retail channel. Furthermore, as we ramps up our major capacity expansion projects in Central America, we are increasingly better positioned to service large replenishment programs for major mass-market consumers.

16.     Likewise, on January 15, 2008, Gildan announced that Defendant Sellyn would speak at the annual ICR XChange Investor Conference and discuss, in general, the Company's finances. In that announcement, the Company reminded that "[a]t the conference, the Company will reiterate that it continues to be comfortable with its most recent EPS guidance, provided on December 6, 2007, of approximately U.S. $1.85 for fiscal 2008...."

17.     In fact, the Company went on to again increase this guidance on January 30, 2008 when it issued a press release announcing its financial results for the fiscal first quarter of 2008. That press release stated, in relevant part that *"[t]he Company has increased its EPS guidance for the full year to a range of U.S. $1.85-U.S. $1.90...."*

18.     During the January 30, 2008 earnings conference call, Defendant Sellyn explained the increased guidance and touted the Company's business prospects. In particular, he stated that Gildan was "leveraging the expertise of [its] Honduras management team to maximize the efficiency of [its] manufacturing operations in the Dominican Republic and Haiti"; that the Company was "optimistic about the market and pricing climate"; and that "Gildan's sales and margins for activewear continue to be strong..."

19.     Defendant Chamandy similarly exalted the business prospects of Gildan by stating that the production at the Dominican Republic site was being ramped up to meet sales targets for 2008 as the Company expected a high annual growth.

20.     The initial guidance of U.S. $1.80- $1.85, its increase, and statements by Defendants about the business prospects of Gildan were, however, materially false and misleading because they failed to adequately represent the true financial condition of the

5

Company which was struggling from below-expected performance due to difficulties at the Dominican Republic facility and was likewise suffering from undisclosed impairments in the value of its inventories.

21.    The earnings guidance for fiscal 2008, therefore, was entirely unfounded.


## THE TRUTH REGARDING GILDAN'S FINANCES IS REVEALED

22.    The unsound nature of the earnings guidance abruptly came to light on April 29, 2008 when the Company was forced to issue a press release revealing that it had to drastically reduce its 2008 guidance from U.S. $1.85-$1.90 to U.S. $1.45-$1.50 (a reduction of roughly 25%) due to problems in the once-touted sock market and at the Dominican Republic facility. The press release specifically stated, in relevant part :

> The lower than anticipated growth in EPS in the second fiscal quarter, compared to the Company's previous EPS guidance, is primarily due to lower than projected unit sales growth in active wear *as a result of a shortfall in production for the Dominican Republic textile facility, a write-down of inventories of discontinued retail product-lines pursuant to the rationalization of Gildan's product-mix within the sock category during the integration of retail information systems*. (emphasis added)

23.    Furthermore, the April 29, 2008 release revealed that the Company had lower than anticipated production in the Dominican Republic facility that would continue to prevent the Company from being able to fulfill any strong sales demands.

24.    This news immediately caused the Company's stock price to fall $10.99 to close at $24.93 per share- a loss of over 30% on approximately 22.5 times the average trading volume.

25.    All the while, however, the Individual Defendants dumped millions of shares at artificially inflated prices based upon the unfounded and misstated 2008 guidance.

26.    In fact, during the Class Period, Defendant Chamandy alone (individually or through an entity wholly owned and controlled by him) sold *$95,267,401.00* worth of Company stock (over two million shares), while Defendant Sellyn himself sold almost one million dollars worth of Company stock ($802,887) during the Class Period.

## DEFENDANTS KNEW ABOUT AND/OR RECKLESSLY DISREGARDED THE FRAUDULENT GUIDANCE.

27.    In connection with the acts and ommissions alleged in this Complaint, Defendants acted with scienter (with knowledge and/or reckless disregard for the truth) in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. In addition to signing or approving the filed earnings releases and financial reports, certain of the Defendants personally made the false oral statements described herein to analysts and investors about the Company's projected earnings, and either knew the true facts about the subjects they were discussing or were reckless in speaking without confirming the facts.

28.    In particular, Defendants knowledge of the illegal and improperly issued earnings guidance and business prospects can be strongly inferred from the fact that Defendants Sellyn and Chamandy, in the ordinary and regular performance of their job responsibilities, had access to highly detailed financial information including monthly reports, accounting reports and

7

software, and financial/accounting meetings that clearly revealed the fraudulent guidance scheme.

29. Defendants' knowledge of the illegal and improperly issued guidance can also be strongly inferred from the Individual Defendants' highly lucrative and suspiciously timed insider sales. Indeed, in two days alone during the Class Period (December 20-21, 2007), Defendant Sellyn sold over $800,000.00 worth of Company stock, while Defendant Chamandy (individually or through an entity wholly owned and controlled by him) sold *over $95 million* in Company shares during the Class Period. The Individual Defendants thus exploited their knowledge of the fraudulent guidance scheme to engage in insider sales of their stock.

30. Defendants made these insider sales at a time when Defendants' improper guidance scheme had pushed Gildan's stock to a record high.

31. These facts show that Defendants Sellyn and Chamandy knew and/or recklessly disregarded the falsity and misleading nature of their public reports of Gildan's financial outlook and business prospects. This showing is further buttressed by the suspiciously timed and massive insider sales that corresponded to the point when the fraud had its greatest impact in inflating the prices of Gildan's stock, and which occurred only months before Defendants began to make their corrective disclosures that caused the stock prices to plummet.

## CLASS ACTION ALLEGATIONS

32. Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased the securities of Gildan between August 2, 2007 and April 29, 2008 inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal

8

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gildan securities were actively traded on the NYSE National Market. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

34.    Plaintiff's claims are typical of the claims of the members of the Class because it and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

35.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

37.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a). Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b). Whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

c). Whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

d). Whether the Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts; and

e). Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

38.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things;

a). Defendants made public misrepresentations or failed to disclose facts during the Class Period;

b). The omissions and misrepresentations were material;

c). Gildan securities traded in an efficient market;

d). The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e). Plaintiff and other members of the Class purchased Gildan securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

39.    At all relevant times, the market for Gildan securities was an efficient market for the following reasons, among others:

a). Gildan securities were listed and actively traded during the Class Period on the NYSE, an open, highly efficient and automated market. The average daily volume of the Gildan common stock during the Class Period was 664,721 shares;

b). As a regulated issuer, Gildan regularly made public filings, including its Forms 10-K, Forms 6-K, Forms 10-Q and related press releases;

c). Gildan was followed by analysts from major brokerages; and

d). Gildan regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosure, such as communications with the financial press and other similar reporting services.

40.    The market for Gildan securities assimilated current information regarding the Company from the publicly available sources described above and, as a result, the price of Gildan securities reflected all known information. As would be expected where a security is traded in an efficient market, material news concerning Gildan's business had an immediate effect on the market price of Gildan's securities, as evidenced by the rapid decline in the market price in the immediate aftermath of Gildan's corrective disclosures as described herein. Under these circumstances, all purchasers of Gildan's securities during the Class Period suffered similar injury due to the fact that the price of Gildan securities was artificially inflated through the Class Period, and they incurred losses when the truth about the fraud was revealed or otherwise leaked into the market. At the times they purchased or otherwise acquired Gildan's securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful

11

conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies. Plaintiff will also rely, in part, upon the presumption of reliance established by a material omission.

## COUNT I

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)

41.    Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

42.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period which did:

(a) deceive the investing public, including Plaintiff and other Class members, as alleged herein;

(b) artificially inflate and maintain the market price of Gildan's publicly traded securities;

(c) cause Plaintiff and other members of the Class to purchase Gildan's publicly traded securities at artificially inflated prices; and

(d) proximately cause Plaintiff's losses when the truth was revealed.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

43.    In addition to the duty of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate

12

truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 *et seq.*), S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to Gildan's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

44.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Gildan as specified herein.

45.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Gildan's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Gildan and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchaser of Gildan's securities during the Class Period.

46.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Gildan's securities were artificially inflated during the Class Period, and then fell as Defendants made corrective

disclosures that were revealed or otherwise leaked into the market. In ignorance of the fact that market prices of Gildan's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Gildan securities during the Class Period at artificially high prices and, as the truth was revealed or otherwise leaked into the market about the artificial inflating in Gildan's stock price was removed, Plaintiff was damaged thereby.

47.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff, the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Gildan stock, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Gildan publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

48.     By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

49.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other member of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

14

## COUNT II

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST SELLYN AND CHAMANDY)

50.    Plaintiff repeats and reiterates the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

51.    Defendants Sellyn and Chamandy each acted as a controlling person of Gildan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of these Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.    In addition, each of these Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

53.    As set forth above, Gildan and these Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests a judgment, as follows:

a). Determining that this action is a proper class action, and certifying proposed class representatives under Rule 23 of the Federal Rules of Civil Procedure;

b). Awarding compensatory damages in favor of Plaintiff and the other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c). Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d). Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 25, 2008                    SCOTT + SCOTT, LLP

DAVID R. SCOTT (DS 8053)
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
P: 860/537-5537
F: 860/537-4432
drscott@scott-scott.com

SCOTT + SCOTT, LLP
ARTHUR L. SHINGLER III
600 B Street, Suite 1500
San Diego, CA 92101
P: 619/233-4565
F: 619/233-0508 (fax)
ashingler@scott-scott.com

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Walter Stampor, on behalf of the Police and Fire Retirement System of the City of Detroit ("Detroit P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Executive Secretary of Detroit P&F. I have reviewed a complaint filed in this matter. Detroit P&F has authorized Scott + Scott LLP to file a complaint and a motion for appointment as lead plaintiff on its behalf.

2.  Detroit P&F did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  Detroit P&F is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Detroit P&F fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  Detroit P&F's transactions in **GILDAN ACTIVEWEAR INC. (GIL)** securities that are the subject of this action are set forth in the chart attached hereto.

5.  Detroit P&F has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *In re Dot Hill Systems Corporation Securities Litigation*, Case No. 06-cv-228 (S.D. Cal.)
    *In re Bausch & Lomb, Inc. Securities Litigation*, Case No. 06-cv-6294 (W.D.N.Y.)
    *In re KLA-Tencor Corp. Securities Litigation*, Case No. 06-cv-4065 (N.D. Cal.)
    *Police and Fire Retirement System of the City of Detroit v. Safenet Inc., et al.*, Case No. 06-cv-5797 (S.D.N.Y.)
    *In re Marvell Technology Group, Ltd. Securities Litigation*, Case No. 06-cv-6286 (N.D. Cal.)
    *In re WSB Financial Group Securities Litigation*, Case No. 07-cv-1747 (W.D. Wash.)
    *In re SiRF Technology Holdings, Inc. Securities Litigation*, Case No. 08-cv-856 (N.D. Cal.)

6.  Detroit P&F has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

    *In re Boston Scientific Corp. Securities Litigation*, Case No. 05-cv-11934 (D. Mass.)
    *In re Sonus Networks, Inc. Securities Litigation*, Case No. 06-cv-10040 (D. Mass.)
    *In re Aetna, Inc. Securities Litigation*, Case No. 07-cv-4451 (E.D. Pa.)
    *In re Verifone Holdings, Inc. Securities Litigation*, Case No. 07-cv-6140 (N.D. Cal.)
    *In re UBS AG Securities Litigation*, Case No. 07-cv-11225 (S.D.N.Y.)
    *Barkett v. Societe Generale et al.*, Case No. 08-cv-2495 (S.D.N.Y.)

1

7.   Detroit P&F will not accept any payment for serving as a representative party on behalf of the Class beyond Detroit P&F's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of June, 2008.

*Walter Stampor*

Walter Stampor
Executive Secretary
*Police and Fire Retirement System of the City of Detroit*

2